No. 23-13178-A

---

# In the United States Court of Appeals for the Eleventh Circuit

---

ALIEDA, MARON, et. al.
*Plaintiffs – Appellants,*

v.

CHIEF FINANCIAL OFFICER OF FLORIDA
*Defendant – Appellee*

---

On Appeal from the United States District Court for the Northern District of Florida
Case No. 4:22-cv-00255-RH-MAF

---

## APPELLEE'S ANSWER BRIEF

---

Florida Department of Financial Services
Office of the General Counsel
Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399
Telephone: (859) 413-3100
Facsimile: (850) 488-0697

Michael Dobson
*General Counsel*
Kimberly Masson
*Chief Legal Counsel*
Russell Monilla
*Attorney*

*Counsel for Defendant-Appellee,
Jimmy T. Patronis, in his official
capacity as the Chief Financial Officer
of the State of Florida*

## INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Appellee certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-26.3 and 27-1(a)(9):

1.      Craig E. Rothburd, P.A., *Law Firm for Appellant*

2.      Dean Mead & Dunbar, *Law Firm for Defendant*

3.      Dobson, Michael, *Attorney for Appellee*

4.      Florida Department of Financial Services

5.      Green, Kelly, *Attorney for Appellant*

6.      Hall, William, *Attorney for Defendant*

7.      Hinkle, Robert, *United States District Court Judge for the Northern District of Florida*

8.      Jeeves Law Group, P.A., *Law Firm for Appellant*

9.      Jeeves Mandel Law Group, P.C., *Law Firm for Appellant*

10.     Jeeves, Scott, *Attorney for Appellant*

11.     Mandel, Roger, *Attorney for Appellant*

12.     Maron, Alieda, *Appellant*

13.     Maron, Lawrence, *Appellant*

14.     Masson, Kimberly, *Attorney for Appellee*

15. McGinn, Daniel, *Attorney for Defendant*

16. Monilla, Russell, *Attorney for Appellee*

17. O'Dell, Julie, *Attorney for Appellant*

18. Patronis, Jimmy, in his official capacity as Chief Financial Officer of the State of Florida, *Appellee*

19. Rothburd, Craig, *Attorney for Appellant*

20. Russell, Daniel, *Attorney for Defendant*

21. Smith, Katzenstein, & Jenkins, *Law Firm for Appellant*

22. Susman, Arthur, *Attorney for Appellant*

23. The Law Office of Arthur Susman, *Law Firm for Appellant*

24. Wagner, Michael, *Attorney for Plaintiff*

25. Wong, Jordane, *Attorney for Defendant*

26. Woodford, Kyle, *Attorney for Plaintiff*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-3(b), Counsel for Appellee certifies that there are no publicly traded corporations or companies that have an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and Eleventh Circuit Rule 28-1(c), Appellee does not believe oral argument is necessary to assist the Court in the disposition of this case.

## STATEMENT REGARDING ADOPTION OF OTHER PARTY'S BRIEF

Appellee is adopting Appellants' Standard of Review section from their Initial Brief.

## PRELIMINARY STATEMENT

Alieda and Lawrence Maron will be referred to as the "Marons" throughout this brief. Jimmy T. Patronis, in his official capacity as Chief Financial Officer for the State of Florida, and the Florida Department of Financial Services will be referred to as the "Department" throughout this brief. The United States District Court for the Northern District of Florida, will be referred to as the "District Court."

Citations to the record below will be noted as "Doc." followed by the document number as listed in the docket for the case below, and the page in the document denoted by "p." and the page number. Citations to the Marons' Initial Brief will be noted as "Initial Brief" followed by the appropriate page number. References to the Appendix will be denoted by "App." followed by the volume and page number.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS

AND CORPORATE DISCLOSURES……………….……………....…………..C1

STATEMENT REGARDING ORAL ARGUMENT………………………………i

STATEMENT REGARDING ADOPTION OF OTHER PARTIES' BRIEF………i

PRELIMINARY STATEMENT…………………………………………………i

TABLE OF CONTENTS…………………………………………………...ii

TABLE OF AUTHORITIES………………………………………………iii

STATEMENT OF JURISDICTION……………………………………xi

INTRODUCTION………………………………………………………1

STATEMENT OF THE CASE………………………………………..2

    I.    Procedural Background………………………………………...2

    II.    Factual Background……………………………………………4

ISSUES PRESENTED AND SUMMARY OF ARGUMENTS…………………8

ARGUMENT……………………………………………………………...10

    I.    The District Court Correctly Dismissed Count I for Failure to State a Claim………………………………………………………10

        A.    The Marons Failed to Demonstrate a Cognizable Property Interest under the Takings Clause and that the Department's Action was the Cause of the Harm……………………………………………11

            1.    No Cognizable Property Interest………………........13

                a.    Existing Laws and Background Principles………..14

                b.    *Texaco* should Control the Analysis………….......20

            2.    The Marons Failed to Demonstrate that the Department's Action was the Cause of the Harm……………………...24

        B.    The Marons' Reliance on *Cerajeski*, and its progenies, and *Tyler* is Misplaced………………………………………………...26

    II.    There was no Justiciable Controversy before the District Court……...31

        A.    The District Court Erred in Finding the Marons had Standing to Assert their Claims………………………………………..32

            1.    Injury in Fact…...…………………………………32

    2.       Traceable to the Department's Actions……………...……35

    3.       Redressable by a Favorable Judicial Decision……………36

   B.     The Marons' Claims are not Ripe ………………………………37

III.    The District Court Erred by Failing to Dismiss Count I of the Complaint on the Basis of State Sovereign Immunity……………………………...39

   A.    No Waiver of Immunity…………………………………………..41

   B.    42 U.S.C § 1983 Does Not Apply to the State of Florida………43

   C.    *Ex parte Young* Exception does not Apply…………………...…44

CONCLUSION……………………………………………………………………48

CERTIFICATE OF COMPLIANCE……………………………………………...49

CERTIFICATE OF SERVICE……………………………………………………50

# TABLE OF AUTHORITIES

## Cases

*Allen v. Wright,*

    468 U.S. 737 (1984)………………………………………………..37

*Am. Pelagic Fishing Co., L.P. v. United States,*

    379 F.3d 1363 (Fed. Cir. 2004)……………………………………….13

*Anderson Nat. Bank v. Luckett,*

    321 U.S. 233 (1944)………………………………………………..16

*Armstrong v. United States,*

    364 U.S. 40 (1960)………………………………………………...13

*Barnes v. Zaccari,*

    669 F.3d 1295 (11th Cir. 2012)……………………………………….42

*Bd. of Regents v. Roth,*

    408 U.S. 564 (1972)………………………………………………14, 25

*Boston Chamber of Com. v. Boston,*

    217 U.S. 189 (1910)…………………………………………...……30

*Brandon v. Holt*,
    469 U.S. 464 (1985)……………………………………..……44

*Brown v. Legal Found. of Washington*,
    538 U.S. 216 (2003)……………………………………………..20

*Cambridge Univ. Press v. Patton*,
    769 F.3d 1232 (11th Cir. 2014)……………………………………...9

*Cerajeski v. Zoeller,*
    735 F.3d 577 (7th Cir. 2013)……………………………………27

*Christianson v. King Cnty.,*
    239 U.S. 356 (1915)……………………………………...16-17, 29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)………………………………………..35

*Clark v. Strayhorn,*
    184 S.W. 3d 906, 914 (Tex. 2006)……………………………22

*Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999)…………………………………..……42

*Colvin Cattle Co. v. United States,*
    468 F.3d 803 (Fed. Cir. 2006)…………………………………...13

*Crocker v. Pleasant,*
    778 So. 2d 978 (Fla. 2001)……………………………………25

*Cunnius v. Reading Sch. Dist.,*
    198 U.S. 458 (1905)………………………………………16, 29

*Cwik v. Giannoulias,*
    930 N.E. 2d 990, 998 (Ill. 2010)……………………………22

*Dani v. Miller,*
    374 P.3d 779 (Ok. 2016)………………………………...22

*Delaware v. New York,*
    507 U.S. 490 (1993)………………………………………17, 29

*Edelman v. Jordan,*
    415 U.S. 651 (1974)……………………………………45-46

*Ex parte Young*,
    209 U.S. 123 (1908)……………………………………………...passim

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3rd Cir. 2016)…………………………………………33

*Fong v. Westly*,
    12 Cal. Rptr. 3d 76 (Cal. Ct. App. 2004)………………………………22

*Fontenot v. McCraw*,
    777 F.3d 741 (5th Cir. 2015)…………………………………………48

*Franchise Tax Bd. v. Alcan Aluminum Ltd.*,
    493 U.S. 331 (1990)…………………………………………………34

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997)…………………………………………………34

*Goldberg v. Frerichs*,
    912 F.3d 1009 (7th Cir. 2019)………………………………………...27

*Green v. Mansour*,
    474 U.S. 64 (1985)………………………………………………...45

*Hamilton v. Brown*,
    161 U.S. 256 (1896)………………………………………….. 16, 29, 39

*Hans v. Louisiana*,
    134 U.S. 1 (1890)…………………………………………………41

*Himely v. Rose*,
    9 U.S. 313 (1809)…………………………………………………18

*Hooks v. Treasurer*,
    961 So. 2d 425 (La. Ct. App. 2007)………………………………...22

*Horne v. Dep't of Agriculture*,
    576 U.S. 350 (2015)…………………………………………12, 40

*In re Folding Carton Antitrust Litigation*,
    744 F. 2d 1252 (7th Cir. 1984)……………………………………27-28

*Jennings v. Stephens*,
    574 U.S. 271 (2015)………...……………………………………..9

v

*Kolton v. Frerichs*,
    869 F. 3d 532 (7th Cir. 2017)……………………………………………27

*Lesage v. Texas*,
    158 F. 3d 213 (5th Cir. 1998)………………………………………..9

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)………………………………………………...13

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)………………………………………………...12

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)………………………………………………....34

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992)……………………………………………....12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)……………………………………………33-34

*Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*,
    11 F.4th 345 (5th Cir. 2021)……………………………………...9

*McKenzie v. Fla. Dep't of Fin. Servs.*,
    No. 04 CA 755 (Fla. Cir. Ct. Apr. 27, 2005)……………………22, 23

*Members of Peanut Quota Holders Ass'n, Inc. v. United States*,
    421 F.3d 1323 (Fed. Cir. 2005)………………………………...14, 25-26

*Nat'l Wildlife Fed'n v. Agric. Stabilization & Conserv. Serv.*,
    955 F. 2d 1199 (8th Cir. 1992)……………………………………………9

*Omnia Commercial Co. v. United States.*,
    261 U.S. 502 (1923)…………………………...……………………..14, 25

*Orlando Bar Group, LLC v. DeSantis*,
    339 So.3d 487 (Fla. 5th DCA 2022)……………………………………3

*Osborn v. Bank of United States*,
    22 U.S. 738 (1824)………………………………………………....32

*Pakdel v. City of San Francisco*,
    141 S. Ct. 2226 (2021)……………………………………………39-40

*Papasan v. Allain,*

      478 U.S. 265 (1986)……………………………………………...…46

*Penn Central Transp. Co. v. New York City,*

      438 U.S. 104 (1978)…………………………………………………12-13

*PennEast Pipeline Co. v. New Jersey,*

      141 S. Ct. 2244 (2021)……………………………………………42-43

*Pennsylvania Coal Co. v. Mahon,*

      260 U.S. 393 (1922)…………………………………………………11-12

*Phillips v. Washington Legal Found.,*

      524 U.S. 156 (1998)…………………………………………...…14, 17, 19-20

*Quern v. Jordan,*

      440 U.S. 332 (1979)……………………………………………………44

*Rowlette v. North Carolina,*

      656 S.E. 2d 619, (N.C. App. 2008)………………………………………22

*Ruckelshaus v. Monsanto Co.,*

      467 U.S. 986 (1984)…………………………………………………13

*Schlesinger v. Reservists Comm. To Stop the War,*

      418 U.S. 208 (1974)…………………………………………………...34

*Simon v. E. Ky. Welfare Rights Org.,*

      426 U.S. 26 (1976)……………………………………………...…36

*Simon v. Weissman,*

      301 F. App'x 107 (3d Cir. 2008)………………………………………...17, 23

*Slayman v. Fed Ex Ground Package Sys., Inc.,*

      765 F.3d 1033 (9th Cir. 2014)………………………………………...38

*Smyth v. Carter,*

      845 N.E.2d 219 (Ind. Ct. App. 2006)………………………………………22

*Spokeo, Inc. v. Robins,*

      578 U.S. 330 (2016)………………………………… 32-34, 36-37

*Standard Oil Co. v. New Jersey,*

      341 U.S. 428 (1951)…………………………………………...…5, 17

*Steel Co. v. Citizens for a Better Env't*,

    523 U.S. 83 (1998)……………………………………………....36-37

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,

    130 S. Ct. 2592 (2010)……………………………………………..14

*Suever v. Connell*,

    579 F.3d 1047 (9th Cir. 2009)………………………………….....23

*Suitum v. Tahoe Reg. Planning Agency*,

    520 U.S. 725 (1997)……………………………………………….40

*Summers v. Earth Island Inst.*,

    555 U.S. 488 (2009)……………………………………………..33

*Summit Medical Associates, P.C. v. Pryor*,

    180 F. 3d 1326 (11th Cir. 1999)…………………………………..47

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,

    216 F.3d 764 (9th Cir. 2000)……………………………………...25

*Texaco, Inc. v. Short*,

    454 U.S. 516 (1982)………………………………………...passim

*Turnacliff v. Westly*,

    546 F.3d 1113 (9th Cir. 2008)………………………………….....23

*Tyler v. Hennepin County*,

    598 U.S. 631 (2023)……………………………………...27, 31-32

*United States. v. Carmack*,

    329 U.S. 230 (1946)……………………………………………..11

*United States. v. General Motors Corp.*,

    323 U.S. 373 (1945)……………………………………………15, 29

*United States. v. Klein*,

    303 U.S. 276 (1938)……………………………………………..16

*United States v. Locke*,

    471 U.S. 84 (1985)……………………………………………....26

*United States v. Pewee Coal Co.*,

    341 U.S. 114 (1951)……………………………………………..12

*U.S. Shoe Corp. v. United. States.,*
    296 F.3d 1378 (5th Cir. 2002)………………………………………...20

*Verizon Md, Ind. v. Pub. Serv. Comm'n,*
    535 U.S. 635(2002)……………...…………………………………...45

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
    449 U.S. 155 (1980)…………………………………...……14, 18-20, 27

*Will v. Michigan Dep't of State Police,*
    491 U.S. 58 (1989)…………………………………………………...44

## **Statutes**

§ 717.001, Fla. Stat.……………………………………………5-6, 21, 26

§ 717.101(9), Fla. Stat.……………………………………………....7

§ 717.105, Fla. Stat.…………………………………………………...7

§ 717.116, Fla. Stat.……………………………………………5-7, 21, 26

§ 717.117, Fla. Stat.………………………………………………...6

§ 717.117(1), Fla. Stat.……………………………………………...7

§ 717.117(3), Fla. Stat.……………………………………………...7

§ 717.117(4), Fla. Stat.……………………………………………...6-7

§ 717.118, Fla. Stat.………………………………………………...8

§ 717.1201, Fla. Stat.………………………………………………5

§ 717.123, Fla. Stat.……………………………………………...5, 7, 8

§ 717.124, Fla. Stat.……………………………………………5, 35

§ 717.124(1), Fla. Stat.……………………………………………...8

§ 717.124(4), Fla. Stat.……………………………………………8, 11

§ 717.124(4)(a), Fla. Stat.…………………………………………2, 46

§ 717.1244, Fla. Stat.………………………………………………8, 35

§ 717.126, Fla. Stat.…...……………………………………………8, 35

28 U.S.C § 1983……………………………………………...passim

28 U.S.C § 2201-02…………………………………………………3, 38

**Rules**

Fla. Admin. Code R. 69G-20.0021(1)……………………………………………....…8

Fed. R. Civ. P. 12(b)(6)…………………………………………………………...10

**Other Materials**

Art. X, § 6(a), Fla. Const…………………………………………………....…3

U.S. Const. amend V…………………………………………………...passim

U.S. Const. amend XI……………………………………………….passim

## STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction over appeals from all final decisions of the district courts of the United States. Appellants brought a two-Count Complaint in United States District Court for the Northern District of Florida on July 15, 2022, alleging violations of United States and Florida Constitutions. The District Court did not have subject matter jurisdiction over this action because the Appellants lack standing, their claims are unripe, and their claims are barred by the Eleventh Amendment. The District Court entered an Order of Dismissal on September 5, 2023, for failure to state a claim as to the U.S. constitutional claims and sovereign immunity as to the Florida constitutional claims. Appellants filed a Notice of Appeal on September 27, 2023.

# INTRODUCTION

Just as with real property, sometimes owners of personal property fail to take any action, over a specified period, to indicate ownership, interest, or awareness of the property. Thus, personal property sometimes goes unused and lays dormant year after year. Rather than allowing that property to sit idly in the possession of a third party or to be placed into a third party's coffers, the Florida Disposition of Unclaimed Property Act ("FLUPA"), chapter 717, Florida Statutes, [1] provides that it be reported and remitted to the Florida Department of Financial Services ("Department") for safeguarding until the rightful owner claims the property.

The Marons knocked at the District Court's door to ask whether a person whose abandoned property was reported to the Department pursuant FLUPA, and who made no attempt to claim it, can then demand that Florida taxpayers pay interest on that property? The Marons found no one was home. The Marons allege the Department[2] has custody of an unclaimed insurance premium refund in the amount of $26.24. However, this case is not about the $26.24, which the Marons have made no attempt to claim. Instead, it is about the time or other value[3] that the property could have

---

[1] Unless otherwise specified, all citations to Florida Statutes are to the 2022 version.

[2] The Chief Financial Officer is the head of the Department. § 20.121, Fla. Stat.

[3] The Marons use the phrase "time or other value" in their Complaint and Amended Complaint; however, for clarity and efficiency the Department will refer to this as interest.

theoretically accrued while in the Department's custody. The Marons' Complaint is premised on the theory that section 717.124(4)(a) of FLUPA results in a taking without just compensation in violation of the United States and Florida Constitutions because the Department does not pay the property owner interest on unclaimed property for the period of time the property is in its custody. This argument is fundamentally flawed because the Marons do not have a cognizable property interest and, as the District Court correctly found, any loss of the property's use is attributable to the Marons' abandonment of the property, not the Department's compliance with a law aimed at preserving unclaimed property and benefiting the citizens of Florida.

The Marons have suffered no actual injury or loss and seek monetary relief for interest that will not be dispersed, *if* and *when* the property is claimed. The Marons are requesting retrospective monetary relief based on a set of facts which are contingent, uncertain, and rest in the future. The District Court erred by finding the Marons have standing to bring their claims and that their claims were not barred by the Eleventh Amendment. This Court should affirm the District Court's dismissal for failure to state a claim on which relief could be granted, or in the alternative, hold that the District Court lacked jurisdiction due to the Marons' failure to articulate a justiciable controversy.

## STATEMENT OF THE CASE

### I.  Procedural Background

On July 15, 2022, the Marons filed a two- Count, class action Complaint against

the Chief Financial Officer in his official capacity for the State of Florida.  In Count I,

the Marons brought a claim for declaratory and injunctive relief under 28 U.S.C. § 1983

and 28 U.S.C. §§ 2201-02,[4] alleging that section 717.124(4) of FLUPA is

unconstitutional pursuant to the Fifth Amendment to the Constitution.  In Count II,

the Marons brought a claim for declaratory and injunctive relief under 28 U.S.C. §§

2201-02, alleging that FLUPA is unconstitutional pursuant to article X, section 6(a) of

the Florida Constitution.  The Complaint generally alleges that the Department holds

$26.24 in unclaimed insurance premium refunds reported in the name of Alieda Maron.[5]

Specifically, the Marons allege that FLUPA violates the takings clause of the

United States Constitution and Florida Constitutions[6] "because it requires the State to

---

[4] The Complaint's Introduction asserts that the Marons are seeking a declaration and injunction under 42 U.S.C. § 1983 and 22 U.S.C. §§ 2201-2202.

[5] After the filing of the Department's Motion to Dismiss, Ms. Maron filed a consented motion for leave to file an Amended Complaint adding her husband, Lawrence Maron, as a named plaintiff.  The District Court granted that motion in its Order of Dismissal. Because no substantive changes were made in the Amended Complaint, all references to the Complaint will encompass the Amended Complaint.

[6] The Complaint includes causes of action relating to the Takings Clause in both the U.S. and Florida Constitutions. Florida Courts have interpreted those provisions as applying "coextensively." *Orlando Bar Group, LLC v. DeSantis*, 339 So. 3d 487, 494 n. 2 (Fla. 5th DCA 2022) (internal citations omitted). Accordingly, all arguments and citations herein apply equally to both the federal and state causes of action.

use for public purposes unclaimed property transferred to its custody without payment of just . . . compensation to property owners for that use when they reclaim their property." Doc. 18, p. 17, 20. The Marons' alleged grievance is that under FLUPA, the Department will pay only the exact amount taken into its custody - $26.24 – and not the interest earned or other compensation for the State of Florida's use of the money while in its custody. In response, the Department filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (6), asserting: (1) the Marons lacked standing; (2) the Eleventh Amendment barred the Marons' claims; and (3) the Marons failed to state a claim for which relief can be granted.

The District Court entered an Order of Dismissal on September 5, 2023, dismissing Count I with prejudice and Count II without prejudice, finding that: (1) the Marons have standing; (2) while the Eleventh Amendment barred a claim for retrospective relief under Count I, it did not bar the Marons' claims for prospective and injunctive relief; (3) the Eleventh Amendment barred the Marons' claims in Count II; and (4) the Marons failed to state a claim for which relief can be granted because it is constitutionally sufficient for the State of Florida to retain the interest earned on unclaimed property. This appeal ensued.

## II.    Factual Background

Each state, acting as *parens patriae* on behalf of its residents, protects the interests of the owner by assuming custody over that person's unclaimed property.[7] "[T]he disposition of [unclaimed] property is a function of the state ... [to be] used for the general good rather than for the chance enrichment of particular individuals or organizations." *Standard Oil Co. v. New Jersey,* 341 U.S. 428, 436 (1951).  In concert with the long-standing public policy that unclaimed property should be used for the collective good of the people of the State of Florida, the Legislature adopted FLUPA in 1961, authorizing the Department to deposit unclaimed property into the State Treasury for the use of the State School Fund. *See* Ch. 61-10, Laws of Fla.; Ch. 87-105, Laws of Fla. (codified at §§ 717.001 to 717.1401, Fla. Stat.).

FLUPA requires the Department to safeguard unclaimed property reported and remitted into its custody. § 717.1201, Fla. Stat.  Personal property is deemed unclaimed under specifically defined circumstances that involve the owner's persistent neglect or absence of interest. §§ 717.102-.116, Fla. Stat.  The Department's obligation to safeguard unclaimed property continues in perpetuity until such time the property is located and claimed by its rightful owner. §§ 717.123, 717.124, Fla. Stat.

---

[7] *See* Origins and Development of Modern Escheat, 61 Colum. L. Rev. 1319, 1330- 31 (1961) ("The character of most abandoned property statutes is protective and custodial, reflecting the interest of society in preventing the deterioration of property through abandonment.").

Florida statutes define unclaimed property as intangible or tangible property that has been abandoned, lost, or neglected by its rightful owner for an extended amount of time. §§ 717.001-.116, Fla. Stat. This extended amount of time is referred to as the dormancy period. *Id.* The dormancy period differs depending on the nature of the intangible property. Once the dormancy period expires, property is presumed unclaimed, and the holder of the property (usually a financial institution or business entity) must report that property to the Department. § 717.117, Fla. Stat. However, before turning over the unclaimed property to the Department, the holder of the property must conduct due diligence and attempt to return the property by contacting the apparent owner,[8] using the name and last known address indicated on the holder's records. § 717.117(4), Fla. Stat. If the holder is unable to return the property to the apparent owner, FLUPA requires the holder to deliver the property to the Department and provide it with the name and last known address of the apparent owner. § 717.117, Fla. Stat.

For example, a written instrument, such as a check for which a financial institution is directly liable, must be outstanding and uncashed for more than five years from the payable date of the check, and the owner of the check must fail to contact the financial institution or otherwise indicate an interest in the check during that period, in

---

[8] "Apparent owner" means the person whose name appears on the records of the holder as the person entitled to property held, issued, or owing by the holder. § 717.101(2), Fla. Stat.

order for the instrument to be presumed unclaimed. § 717.105, Fla. Stat. In a final attempt to contact, locate, and return the property to its apparent owner, the financial institution liable for the value of the check is statutorily directed to mail written notice to the owner at the owner's last known address before reporting the value of the check to the Department. §§ 717.101(9), 717.117(4), Fla. Stat. Only after this period of absence and lost contact with the apparent owner (such as if there is no owner generated activity after the notice or if the notice is returned as undeliverable) is the property legally presumed unclaimed and thus reportable into the custody of the Department. *Id.* It is the absence and neglect of the property owner that triggers the holder's obligation to deliver the property into the custodial possession of the Department. §§ 717.102-.116, Fla. Stat.

Along with the unclaimed property, holders must report the owner's name, last known address, social security number (if known), and any beneficiary or joint owner's information. § 717.117(1), Fla. Stat. The Department utilizes this information to create a record through which an owner of unclaimed funds remitted to the Department can come forward to claim the property. § 717.117(3), Fla. Stat. This record is commonly referred to as an unclaimed property account. However, the Department does not put the unclaimed funds it receives into a private account for each individual owner. Rather, the Department maintains a $15 million dollar fund used to run the program and pay claims, and the remainder is deposited into the State School Trust Fund. § 717.123, Fla. Stat. Once in the Department's possession, FLUPA directs the Department to account

for the property, notify the apparent owner at his or her last known address of the availability of the property to be claimed, and list the property on a publicly accessible website. §§ 717.118-.123, Fla. Stat.

Any person claiming an interest in unclaimed property may file a claim with the Department. § 717.124(1), Fla. Stat. Claims for unclaimed property are to be submitted to the Department on prescribed forms together with documentation proving entitlement to the unclaimed property. Fla. Admin. Code R. 69G-20.0021(1). When the Department receives a claim for unclaimed property, it determines the merits of the claim and whether the claimant established entitlement to the property by a preponderance of the evidence. *See* §§ 717.1244, 717.126, Fla. Stat. No statute of limitations exists which would prevent an owner from being able to claim the funds. The full amount of the unclaimed funds reported and remitted to the Department is available for return to the rightful owner in perpetuity – without any cost assessed to the owner. § 717.124(4), Fla. Stat.

### ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

The issues before this Court are: (1) whether the Marons have standing to assert their claims; (2) whether the Eleventh Amendment bars the Marons' claims; and (3) whether the Marons stated a claim for which relief can be granted.

Assuming *arguendo* that the District Court had jurisdiction, it correctly dismissed Count I of the Marons' Complaint because it failed to state a claim for which relief can be granted. Specifically, the challenged provision of FLUPA does not amount to a

taking compensable under the Fifth Amendment. Notably, the Marons do not challenge FLUPA's presumption that the property was unclaimed, nor do they allege that any of their rights were violated by the transfer of the unclaimed property to the Department. The Marons' sole contention is that the Constitution requires the Department to pay interest on unclaimed property. However, this argument is at odds with the principles set forth in *Texaco, Inc. v. Short*, 454 U.S. 516 (1982), and applied by courts around the nation - that there is no cognizable property interest in abandoned property, and a state is not required to compensate an owner for the consequences of his own neglect. Accordingly, this Court should affirm the District Court's dismissal with prejudice for failure to state a claim.

The Marons argue that the District Court correctly found they had standing and their claim under the United States Constitution was not barred by the Eleventh Amendment. Initial Brief, p. 13. The Department did not file a cross-appeal to challenge the District Court's order as to these findings because the District Court dismissed both Counts of the Marons' Complaint. A cross-appeal is not necessary to raise jurisdictional arguments such as standing. *See Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 351 n.1 (5th Cir. 2021); *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conserv. Serv.*, 955 F.2d 1199, 1203 (8th Cir. 1992). Moreover, the Department is entitled to present alternative grounds for upholding the judgment below. *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015); *Lesage v. Texas*, 158 F.3d 213, 216 n.1 (5th Cir. 1998), rev'd on other grounds, 528 U.S. 18 (1999); *cf. Cambridge Univ. Press v. Patton*, 769 F.3d

1232, 1255 & n.16 (11th Cir. 2014) (declined to consider state immunity asserted by defendants who did not cross-appeal when they did not prevail as to all claims below, and the issue was outside the scope of the appellants' brief).

The District Court lacked subject matter jurisdiction for three reasons. *One*, the Marons failed to demonstrate standing because they have not suffered an injury in-fact traceable to the Department's action that would be redressed by a favorable judicial resolution. The allegations that *when* they claim the property, and *if* their claim is approved, they will not receive the interest on the unclaimed property held by the Department, demonstrate that there is no concrete and particularized injury to redress. *Two*, the Marons' claims are not ripe for judicial resolution because there has been no final agency determination that demonstrating they have suffered a constitutional harm. *Three*, the Eleventh Amendment bar suits against an unconsenting state by its own citizens seeking to impose a liability which must be paid from public funds in the state treasury. Florida has not waived its sovereign immunity, and the Marons have not demonstrated that an exception applies to their claims.

## ARGUMENT

### I.  The District Court Correctly Dismissed Count I for Failure to State a Claim

The District Court correctly dismissed Count I the Marons' Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The gravamen of the Complaint is that *if* the Marons submit a claim for the subject unclaimed property, and *if* the Department determines them to be the rightful owners, the Department will

have effected a taking by not paying them interest on the unclaimed property while it was in its custody. The Complaint contends that FLUPA's directive, pursuant to section 717.124(4), Florida Statutes, that the Department pay the exact amount of money received from the holder back to the unclaimed property owner is an unconstitutional taking. Significantly, the Marons do not challenge the State of Florida's authority to regulate the use of personal property or define the circumstances in which property is presumed unclaimed, and thus reportable by the holder into the custodial care of the Department. Nor do the Marons dispute that the subject unclaimed property came to be in the Department's custody because of their own neglect. *See* Doc. 18, p. 12. Rather, the Marons take issue with the State of Florida's collateral benefit from the unclaimed property until the owner expresses interest in the property by reclaiming it. *See* Doc. 18, p. 17. This contention rests on a fundamentally flawed understanding of the nature of a taking and is inconsistent with United States Supreme Court precedent, as well as a majority of state and federal decisions.

## A. The Marons Failed to Demonstrate a Cognizable Property Interest under the Takings Clause and that the Department's Action was the Cause of Harm

The concept of a taking in law most often flows from eminent domain: the inherent power of the sovereign to take private property, as principally constrained by the "public use" and "just compensation" prerequisites of the Takings Clause. *United States v. Carmack*, 329 U.S. 230, 241-42 (1946). The paradigmatic taking requiring just

compensation is a direct government appropriation or physical invasion of private property. *See, e.g., United States v. Pewee Coal Co.,* 341 U.S. 114 (1951). Protection from the physical dispossession of property is warranted because that appropriation "deprive[s] the owner of 'the rights to possess, use and dispose of the property." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 360 (2015) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). However, the government does not have to initiate formal eminent domain proceedings to affect a taking for which just compensation is required. Beginning with *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393 (1922), the U.S. Supreme Court recognized that government regulation of private property may be so onerous that its effect is tantamount to a direct appropriation or ouster.

The Supreme Court has staked out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes: (1) where the regulation requires an owner to suffer a permanent physical invasion of her property, *Loretto,* 458 U.S. 419 (1982), or (2) completely deprives an owner of "*all* economically beneficial us[e]" of the property, *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019 (1992). Outside of these two narrow categories, regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978) (the regulation's economic impact on the claimant, the extent to which it interferes with distinct investment-backed expectations, and the character of the

government action).  Because the inquiries reflected in *Loretto, Lucas*, and *Penn Central* all aim to identify regulatory actions that are functionally equivalent to a direct appropriation of or ouster from private property, each focuses upon the severity of the burden that government imposes upon property rights.  Thus, even in cases involving regulatory takings, the concept that a taking is something forced on an individual is still present.  *See Armstrong v. United States*, 364 U.S. 40, 49 (1960).  Here, the regulation at issue provides the Department with custody of personal property that was abandoned by its owner.  If the rightful owner comes forward to claim it, they are paid the exact amount the Department took custody of.  This is a far cry from any notion of a *per se* taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005).

At the very least, to state a claim for a compensable taking, a plaintiff must show that they have a constitutionally protected property interest, that the government took for public use, and that just compensation was not paid. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000-01 (1984).  The Takings Clause is not implicated unless the government conduct affects "property" cognizable under the clause. *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F. 3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005). Thus, before a court gets to the analysis of whether a taking occurred and if just compensation was paid, two threshold issues must be determined: whether a plaintiff has raised a recognized property interest under the Takings Clause, *Colvin Cattle Co., Inc. v. United States*, 468 F. 3d 803, 806 (Fed. Cir. 2006), and whether the harm to or

deprivation of that property interest was caused by the government's conduct, *Omnia Commercial Co. v. United States*, 261 U.S. 502, 510 (1923).

### 1. No Cognizable Property Interest

A constitutionally protected property right is a precondition for a valid takings claim. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).[9] A property interest is constitutionally protected interest if an individual is entitled to it under state law. *Id.* Concepts that define the bounds of a property interest - the sticks in the "bundle of rights" - include the law creating it, existing rules and understandings, and "background principles" of the existing law when the property was acquired. *See, e.g., Members of Peanut Quota Holders Ass'n, Inc. v. U.S.*, 421 F.3d 1323, 1330 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006). For Fifth Amendment purposes, the concept of property is more than the physical item itself or its economic value, it also consists of "the group of rights which the so-called owner exercises in his dominion of the physical thing," such "as the

---

[9] Though *Bd. of Regents v. Roth* was decided on due process grounds, the U.S. Supreme Court has applied this principle to its Takings Clause analysis for decades. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998); *Webb's*, 449 U.S. 155, 161 (1980); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2597 (2010).

right to possess, use and dispose of it." *United States v. General Motors Corp.,* 323 U.S. 373, 377–78 (1945).

### a. Existing Laws and Background Principles

Modern unclaimed property laws are derived from the English common law doctrines of escheat and *bona vacantia.*[10]   Historically, under the doctrine of escheat, when a tenant died without heirs, any unowned real property passed to the tenant's feudal lord.  If the feudal lord could not be identified, the property escheated to the sovereign.  Because escheat only applied to real property, the complementary doctrine of *bona vacantia*[11] emerged to apply to personal property.  This doctrine was premised on the belief that the sovereign had a more equitable right to unclaimed personal property than a stranger and that by taking possession of the property, the sovereign would minimize disputes between private parties over the right of possession.  By the nineteenth century, many states had passed escheat statutes to deal with the distribution

---

[10] For a more comprehensive history of the derivation of modern unclaimed property laws, including their roots in English common law, *see* Origins and Development *supra* n. 7; David C. Auten, Modern Rationales of Escheat, 112 U. Pa. L. Rev. 95 (1963).

[11] Bona vacantia is distinguishable from escheat because the sovereign's claim to the personal property was based on the absence of any other owner, rather than simply its status as ultimate owner. Furthermore, collecting unclaimed personal property under the doctrine of bona vacantia was, at least initially, custodial, whereas traditional escheat vested immediate ownership in the sovereign.

of real property to the state, and thereafter, state statutory provisions governing the distribution of personal property began to emerge. [12]

Indeed, for almost two centuries, states have been escheating intangible private property deemed abandoned without violating the Constitution. *E.g., Christianson v. King Cnty.*, 239 U.S. 356 (1915); *United States v. Klein,* 303 U.S. 276 (1938); *Anderson Nat'l Bank v. Luckett,* 321 U.S. 233 (1944). In *Provident Institution for Savings v. Malone*, 221 U.S. 660 (1911), the U.S. Supreme Court first considered the constitutionality of an abandoned property statute that permitted an Attorney General to apply to the probate court for the value of savings deposits that had laid dormant for thirty years. The bank argued that the presumption of abandonment and subsequent confiscation of the unclaimed funds deprived it of the benefit of such deposits without due process of law. *Id.* at 665. The Court rejected the bank's argument finding that the state's statute as to the abandoned funds was a reasonable exercise of its supervisory power. *Id.* at 666.

States have well-established authority, consistent with their police powers, to regulate and oversee property ownership to prevent stale property interests and ownership uncertainties. *Cunnius v. Reading Sch. Dist.*, 198 U.S. 458 (1905). More

---

[12] The Supreme Court first upheld the constitutionality of a state law regulating the escheat of an intestate decedent's real property in 1896. *Hamilton v. Brown*, 161 U.S. 256, 263 (1896) ("[I]n this country, when the title to land fails for want of heirs and devisees[,] it escheats to the State as part of its common ownership, either by mere operation of law, or upon an inquest of office, according to the law of the particular State.").

recently, the Supreme Court has reaffirmed the states' ability to regulate abandoned personal property as a power exercise of their police powers – "[s]tates as sovereigns may take **custody of** *or* **assume title to** abandoned personal property as *bona vacantia*." *Delaware v. New York*, 507 U.S. 490, 497 (1993) (emphasis added) (citing *Christianson*, 239 U.S. at 365–66); *Standard Oil Co. v. New Jersey*, 341 U.S. 428 (1951); *Texaco, Inc. v. Short*, 454 U.S. 516 (1982).

At the same time, courts have long applied the common law rule of "interest follows the principal." As the U.S. Supreme Court recognized, "the rule that 'interest follows principal' has been established since at least the mid–1700's." *Phillips v. Wash. Legal Found.,* 524 U.S. 156, 165 (1998) (citing *Beckford v. Tobin,*1 Ves. Sen. 308, 310, 27 Eng. Rep. 1049, 1051 (Ch. 1749)). The rule has been adopted by the common law of many, if not all, states, *Id.* at 165 n. 5, but that does not mean it was meant to apply in all cases or that it is immutably without exception. *Simon v. Weissman*, 301 F. App'x 107, 111 (3d Cir. 2008).

Interest on money loaned became a common commercial practice in England and was recognized by statute as early as 1545. *N. Ind. Pub. Serv. Co. v. Citizens Action Coalition of Ind., Inc.*, 548 N.E. 2d 153, 158 (Ind. 1989) (citing *McCormick on Damages,* § 51 at 208) (1935). It took over two hundred years for England to recognize interest as damages, and even then, it was only allowed "upon a contract for payment of money on a day certain." *Id.* As such, it was recognized early in America that interest should

be allowed as damages for the wrongful withholding of another's funds. *Id.* at 159. This view found expression in the maxim "interest goes with the principal, as the fruit with the tree." *Himely v. Rose*, 9 U.S. 313, 319 (1809). Thus, where an ascertainable amount of money was owed to another, and it was wrongly being withheld, denying interest on the money amounted to a double wrong by depriving the person owed of the increase to which he was entitled. *Nashua & Lowell R. Corp. v. Boston & Lowell R. Corp.*, 61 F. 237, 251 (1st Cir.1894). The historical development of this doctrine shows that it was originally quite limited and was intended to apply to instances involving a recognized obligation of debt because one party possessed property which belonged to a second, known party - not every situation involving personal property held by someone other than the property owner. *Simon*, 301 F. App'x at 111.

The Marons have placed the greater weight of their argument on this common law doctrine, relying on *Webb's,* 449 U.S. 155, in the hopes that this doctrine will carry the day in the determination of whether a cognizable property right exists. It does not.

The issue before the U.S. Supreme Court in *Webb's* was whether a statute allowing the clerk of court to retain interest earned on interpleader funds deposited by a litigant, where a separate and distinct statute authorized the clerk to also charge a fee based on the amount deposited, was a taking in violation of the Fifth Amendment. *Id.* Eckerd's of College Park entered into an agreement to purchase Webb's assets, but at closing, Webb's debts appeared to exceed the purchase price. *Id.* at 156. Eckerd's filed

a complaint of interpleader and deposited the purchase funds into the court registry. *Id.* at 156-57. The principal of the fund, minus the service fee, was turned over to the receiver, but the interest, which exceeded $100,000, was not. *Id.* at 158. The Supreme Court held that a statute allowing a county to retain interest earned on interpleaded funds deposited in the court's registry was unconstitutional, *where a separate and distinct state statute authorized a clerk to charge a fee* based on the amount deposited for the clerk's services in receiving the fund into the registry, *where the fund* was concededly private and *was required by statute in order for the depositor to avail itself of statutory protection* from the claims of creditors. *Id.* at 163-64 (emphasis added).

*Webb's* does not support the Marons' case, as the Supreme Court's major issue was with the two statutes operating together to allow the clerk to double dip into private funds. The Court itself noted the limited application of the holding, stating "[w]e express no view as to the constitutionality of a statute that prescribes a county's retention of interest earned, where the interest would be the only return to the county for services it renders." *Id.* at 163-65.

The Marons also rely on a line of U.S. Supreme Court cases dealing with Interest on Lawyers' Trust Accounts (IOLTA), citing to *Phillips v. Washington Legal Found.,* 524 U.S. 156 (1998), to assert their entitlement to interest on unclaimed property. In *Phillips*, the constitutionality of Texas' IOLTA program was challenged. *Id.* The Supreme Court held that under Texas law, the interest earned on client funds held in an IOLTA is the

private property of the client for Takings Clause purposes. *Id.* The Court however, reserved ruling on whether the IOLTA interest had been "taken" by Texas, as well as the amount of "just compensation," if any, that was due. Notably, the more recent Supreme Court case upholding the right of state bar associations to retain the interest earned on IOLTA is not mentioned in the Marons' brief. *Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003).

The principal in *Webb's* was deposited into the court registry by a litigant to protect itself in a commercial transaction. Likewise, in *Phillips* the principal was client money that attorneys were required to deposit into an IOLTA. The identity of the rightful owner was not in question and the property was never deemed abandoned or unclaimed. The present case does not involve interpleaded funds deposited by a private party into the government's possession or client money deposited into an individual account. Rather, it involves property that was presumed by statute to be unclaimed, with the identity and/or the whereabouts of the rightful owner unknown. Furthermore, unlike the principal property in *Webb's* and *Phillips*, unclaimed property is not deposited into a separate, identified account for each apparent owner. For accrued interest to rise to the level of private property in the takings context, the principal must be held in an identified private account. *U.S. Shoe Corp. v. United States*, 296 F. 3d 1378, 1384 (5th Cir. 2002). Thus, *Webb's* and *Phillips* involved property with a fundamentally different status than the instant case and should not control the analysis.

### b. *Texaco* Controls the Analysis

In *Texaco, Inc. v. Short*, the U.S. Supreme Court was presented with a takings challenge to Indiana's Dormant Mineral Interests Act which directed the reversion of mineral rights to the surface property owner following a twenty-year period of abandonment. 454 U.S. at 518. Noting the primary difference between a state's seizing of personal property versus accepting custody of property because of an owner's abandonment of interest therein, the Supreme Court upheld the constitutionality of Indiana's law. *Id.* at 530. The Court recognized that "States have the power to permit unused and abandoned interests in property to revert to another after the passage of time." *Id.* at 526. The Court noted, "[i]n ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, [the] Court has never required the State to compensate the owner for the consequences of his own neglect." *Id.* at 530. "It is the owner's own failure to make use of the property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation." *Id.*

The Marons argue that *Texaco* should not control here because it pertains to abandoned property and the case at hand pertains to unclaimed property. Initial Brief, p. 27. This argument focuses on form rather than substance and forgets that unclaimed property is personal property that has been abandoned, lost, or neglected by its rightful owner for an extended amount of time. §§ 717.001-.116, Fla. Stat.

Many other well-reasoned state court decisions[13] also support the constitutionality of FLUPA and the District Court's reliance on *Texaco*. For example, a Florida circuit court previously upheld FLUPA against a takings claim virtually identical to that asserted by the Marons. *McKenzie v. Fla. Dep't of Fin. Servs.*, No. 04 CA 755 (Fla. Cir. Ct. Apr. 27, 2005); *see* Doc. 9, p. 35-44.

In *McKenzie*, the plaintiffs made a claim to the Department for unclaimed property and received the full amount of the property that was reported to the Department by the holder. Plaintiffs then filed a constitutional challenge, alleging that the Department's failure to pay them the amount of interest generated by their property while it resided in the Department's custody constituted a taking without just compensation in violation of the Constitution. The circuit court specifically found that

---

[13] *Dani v. Miller*, 374 P.3d 779, 794 (Ok. 2016) (a takings claim for interest on unclaimed property under a custodial scheme is "meritless"); *Cwik v. Giannoulias*, 930 N.E.2d 990, 998 (Ill. 2010) (no 'taking' when the state retained interest earned on plaintiffs' unclaimed property held in its custody); *Rowlette v. North Carolina*, 656 S.E. 2d 619, 626 (N.C. App. Ct. 2008), *review denied,* 362 N.C. 474 (2008) (a state comes into possession of unclaimed property due to the owner's neglect and abandonment . . . . the capture of interest accruing on that property by a state is not a taking); *Hooks v. Treasurer*, 961 So. 2d 425, 432 (La. Ct. 2007), *cert. denied,* 967 So. 2d 507 (La. 2007) (duty to safeguard abandoned property cannot logically or fairly be stretched to create a higher fiduciary duty to pay interest not earned by any action of an owner who abandoned his property and investment opportunities by failing to maintain and care for the property.); *Clark v. Strayhorn*, 184 S.W. 3d 906, 914 (Tex. 2006), *review denied* (May 12), *cert. denied,* 549 U.S. 995 (2006) (once property presumed abandoned, the State's lawful use of that property cannot be an unconstitutional taking); *Smyth v. Carter*, 845 N.E. 2d 219, 224 (Ind. App. Ct. 2006), *transfer denied,* 860 N.E. 2d 588 (Ind. 2006), *cert. denied,* 549 U.S. 1181 (2007) ("interest follows the principal" rule does not apply where owner's actions cause the loss of ownership rights); *Fong v. Westly,* 12 Cal. Rptr. 3d 76 (Cal. App. Ct. 3d 2004).

FLUPA did not violate the Constitution because the Department was not required to compensate an owner for the consequences of their own neglect. Doc. 9, p. 39.

> Under [FLUPA], **the Department acting in the public interest, exercises the State's sovereign right to take 'custody and control' of abandoned property** . . . with an eye towards returning such property to the rightful owners. Although [FLUPA] requires the holder of unclaimed property to deliver it to the Department, the State merely takes custody . . . . [FLUPA] provides an owner the right – in perpetuity – to recover his or her property from the State, but [it] . . . does not give a property owner any right to expect any earnings or other appreciation in the property while it is in the State's custody.
>     . . . .
>     . . . **Delivery of** the McKenzies' **property to the Department did not constitute a compensable 'taking'** . . . . **neither did the return of the Mckenzies' property to them without interest** . . . . **[N]o constitutional taking occurs where a state exercises its right to take custody and control of abandoned property, as opposed to taking absolute title** . . . .

*Id.* (internal quotations omitted) (emphasis added). Furthermore, the Third and Ninth Circuits have held that no Fifth Amendment taking occurs when a state distributes unclaimed or abandoned property upon proof of ownership, but retains the interest earned during the time the property was in the state's custody. *Simon v. Weissman*, 301 F. App'x 107 (3d Cir. 2008); *Turnacliff v. Westly*, 546 F.3d 1113 (9th Cir. 2008); *Suever v. Connell*, 579 F.3d 1047 (9th Cir. 2009).

In *Simon,* the plaintiff alleged that Pennsylvania's failure to pay interest generated by property held in custody under its abandoned property program violated the Takings Clause based on the common law "interest follows principal" rule. 301 F. App'x at 110. The Third Circuit, following *Texaco,* held there is no constitutional property right to

interest from abandoned property, reasoning that a property owner cannot claim that he is "owed the fruit after abandoning the tree." *Id.* at 112. The Third Circuit explained that the "interest follows principal" rule "was never intended to apply to every situation involving personal property by someone other than the owner," and that there was no satisfactory legal support for the contention that the doctrine of "interest follows the principal" applies to abandoned property. *Id.* at 111-12.

In *Turnacliff*, the executor of an estate claimed that California failed to pay "just compensation" because the state paid less than actual interest. 546 F.3d at 116-17. The Ninth Circuit ruled that, when an estate's property becomes abandoned under the California Code of Civil Procedure and is then "taken" by California, "no further compensation is due to the [e]state because when the [e]state abandoned its property, it forfeited any right to interest earned by that property." *Id.* at 1119. The court approved of *Texaco's* approach to abandoned property, noting that "the long-running principle articulated in [*Texaco*] applies with equal force to [a] case involving commercial paper." *Id.* In *Suever*, the Ninth Circuit held that "Plaintiffs are not entitled to recover anything beyond the actual cash proceeds that the Controller realized upon liquidating their non-cash escheated property." 579 F.3d at 1060.

Just as in *Texaco,* where the owner's failure to use the mineral rights within a statutorily defined period caused abandonment of those rights, the Marons' failure to use or exercise dominion over the subject unclaimed property within the time

prescribed by FLUPA caused an abandonment of their property rights.  The Marons have no cognizable right to interest on unclaimed property and there can be no taking when, if ever, they decide to file a claim.

## 2. The Marons Failed to Demonstrate that the Department's Action was the Cause of the Harm

The Marons failed to establish that the Department's action was the cause of the alleged taking of this interest.  A takings claim can succeed only when the adverse impact on the property was caused directly by the challenged government conduct. *Omnia Commercial Co.*, 261 U.S. at 510.  When addressed in a regulatory taking cases, the standard for causation is variously stated: the harm must be "proximately caused" by the government, *Penn Central*, 438 U.S. at 124, or be more than the "incidental result" of the challenged regulation. *Lucas*, 505 U.S. at 1027 n.14.  The owner must show a substantial cause-and-effect relationship, excluding the probability that other forces alone produced the injury. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 783 (9th Cir. 2000), aff'd on other grounds, 535 U.S. 302 (2002).

A property interest is a constitutionally protected interest if a litigant can show that they are entitled to it under state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Crocker v. Pleasant*, 778 So. 2d 978 (Fla. 2001) (constitutionally protected rights derive from a property interest in which the individual has a legitimate claim). Concepts that define the sticks in the property "bundle of rights" include the law creating it and existing rules and understandings. *Members of Peanut Quota Holders*, 421 F.3d 1323, 1330

(Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006). FLUPA, along with other unclaimed property acts across the nation, define unclaimed property as intangible or tangible property that has been abandoned, lost, or neglected by its rightful owner for an extended amount of time. *See* §§ 717.001-.116, Fla. Stat. Furthermore, since its enactment in 1961, FLUPA has never provided for the payment of interest that may have accrued on unclaimed property while in the Department's custody. Neither the State of Florida, nor any existing case law, applicable rules or understandings have ever created an expectation of interest on abandoned property. The Department cannot take a stick in the bundle that never existed in the first place.

If the Marons are the rightful owners of the unclaimed property, then they statutorily abandoned their property interest and have no property right in any interest generated from that property. As *Texaco* explained, "it is the owner's own failure to make use of the property—and not the action of the State—that causes the lapse of the property right." 454 U.S. at 530; *see e.g., United States v. Locke*, 471 U.S. 84 (1985). Thus, the Marons did not, and cannot, even with well-pled allegations, show that the loss of the right to interest on the subject unclaimed property was more than the "incidental result" of the challenged regulation, as it was their abandonment and neglect that triggered the regulation and was the proximate cause of the alleged harm.

**B. The Marons' Reliance on *Cerajeski*, its progenies, and *Tyler* is Misplaced**

The Marons rely on two decisions in asserting that *Texaco* should not apply: *Cerajeski v. Zoeller,* 735 F.3d 577 (7th Cir. 2013), and *Tyler v. Hennepin County,* 598 U.S. 631 (2023).  In *Cerajeski and its progenies,*[14] the Seventh Circuit took a different approach not only to its own precedent in *In re Folding Carton*, 744 F.2d 1252 (7th Cir. 1984), where it stated that there is no bar to interim government use of temporarily escheated money deposited in the Treasury, but also from the Third and Ninth Circuits by extending *Webb's* to cases involving states' unclaimed property acts on the basis that those acts are custodial acts and not true escheat acts.  However, there are significant and valid reasons to distinguish the non-payment of interest under FLUPA from the taking involved in *Webb's*.

*In re Folding Carton* involved an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons in violation of the Sherman Act (15 U.S.C. § 1). *Id.* at 1253.  Appeals were filed by two former defendants and six former class-member plaintiffs and related chiefly to the district court's disposition of an approximately $6,000,000 reserve fund established to pay late claims and to meet various expenses and contingencies connected with the distribution of the $200,000,000 settlement fund. *Id.*

---

[14] *Kolton v. Frerichs*, 869 F.3d 532 (7th Cir. 2017); *Goldberg v. Frerichs,* 912 F.3d 1009 (7th Cir. 2019). In *Kolton* and *Goldberg*, the Seventh Circuit reiterated its analysis from *Cerajeski*.

In agreeing with the district court's finding that neither the plaintiff class nor the settling defendants had any right to the reserve fund the Seventh Circuit stated:

> [W]e direct that the remainder of the reserve fund escheat to the United States. . . .
>
>   . . . .
>
>   . . . 28 U.S.C. § 2041. . . applies to "All monies paid into any court of the United States or received by the officers thereof, in any case pending or adjudicated in such court * * *." Here the $200,000,000 fund was paid into the district court . . . thus satisfying that portion of the escheat statute. . . . [28 U.S.C. § 2042] initially refers to "money deposited under section 2041" and provides that **money so deposited and unclaimed for five years** shall be deposited in the federal Treasury "in the name and to the credit of the United States". . . . [A]lmost five years have now elapsed, and we are permitting unpaid class members to claim until a year from this opinion, which will be **well beyond the unclaimed five years specified** in Section 2042. . . . [I]t is doubtful that any claimants will come along thereafter. Nevertheless, the open-ended closing sentence of 28 U.S.C. § 2042 **will allow "Any claimant entitled"** thereto **to recover from the United States after the escheat.**
>
>   . . . .
>
>   . . . To that extent, the **escheat** is **impermanent** and also **raises no unconstitutional taking**. Since **any legitimate claimant** has been **afforded an adequate remedy against the United States, there is no bar to interim governmental use of the escheated money** "deposited in the Treasury and to the credit of the United States". . . .

*Id.* at 1255. (emphasis added).

The Seventh Circuit diverged from *In re Folding Carton* in *Cerajeski* and its progenies.  In *Cerajeski*, the plaintiff "contend[ed] that the state's retention of the interest is a taking that violates the takings clause of the Constitution because the owner is paid nothing for his lost interest." 735 F.3d at 579.  The Seventh Circuit focused on the fact that, under the challenged statute, the state did not "seize unconditional title to

abandoned property" but rather presumed the property abandoned and allowed the property to be claimed. *Id.* at 580-81. In the Court's view, because the state did not immediately take title to the unclaimed property, the plaintiff was entitled to the interest earned on the property under the "interest follows principal" rule. *Id.* at 583. However, the court acknowledged that if the state had taken title to the property, there would be no taking as a "state can take abandoned property without just compensation." *Id.* at 581.

The Seventh Circuit placed the majority of its focus on the difference between escheatment and the custodial nature of the unclaimed property act. However, as the District Court below correctly explained, the overemphasis on "who technically holds title" trivializes the constitutional interest protected by the Takings Clause. Doc. 27, p. 11. It has long been the law of the land that states as sovereigns may take custody of *or* assume title to abandoned personal property. *E.g., Delaware v. New York*, 507 U.S. 490, 497 (1993) (citing *Christianson v. King Cty.*, 239 U.S. 356, 365-66 (1915)); *Cunnius v. Reading Sch. Dist.*, 198 U.S. 458, 469–476 (1905); *Hamilton v. Brown*, 161 U.S. 256, 263–264 (1896). If a state can constitutionally terminate an owner's rights in abandoned real property and take title to it, there should be no question that a state may constitutionally act as a custodian for the owners of unclaimed insurance premium refunds. It is hard to see how a custodial program as opposed to a permanent escheat program would defy

the objectives of the Fifth Amendment by giving the rightful owner back what they abandoned. *Simon*, 301 Fed. Appx. at 114.

Even the Marons assert that if the Department had taken title to the unclaimed property, they would not question the State of Florida's right to keep the interest earned on the property. *See* Initial Brief, p. 25-27; Doc. 12, p. 27-32. The State of Florida has decided that the best course of action is for the Department to take *custody* of unclaimed property – not title – so that the property can be returned to the rightful owner once that owner steps forward. While the Department holds the unclaimed property, the State of Florida gains the beneficial use of it. Notably, the Marons have not challenged the Department's custody of the unclaimed property. Rather, they are challenging the collateral benefit the State of Florida gains while the alleged unclaimed property is in the Department's custody. The Fifth Amendment is most concerned with "the property owner's loss" and not the "government's gain." *Brown*, 538 U.S. at 235-236 (citing *Boston Chamber of Comm. v. Boston*, 217 U.S. 189, 195 (1910)); *see also Gen. Motors Corp.,* 323 U.S. at 377–78; *In re Folding Carton*, 744 F. 2d 1252 (7th Cir. 1984) (escheat that is impermanent raises no issues of an unconstitutional taking). Furthermore, because the Marons have statutorily abandoned their property, and, thus have no property right in any interest generated from the property, the Department has not effected a taking.

In *Tyler v. Hennepin County,* the plaintiff challenged a forfeiture statute that allowed the county to sell her home and keep the proceeds in excess of her tax debt. 598 U.S. 631 (2023). The county sold the plaintiff's home "for $40,000 to satisfy a $15,000 tax bill" and instead of returning the remaining $25,000, the county kept it for itself. *Id.* The issue before the U.S. Supreme Court was whether the remaining value was "protected from uncompensated appropriation by the State" under the Takings Clause. *Id.* at 638. The county argued that the failure to pay taxes amounted to the constructive abandonment of the property and attempted to portray the case as just another example in the long tradition of states taking title to abandoned property. *Id.* at 646-47. The Supreme Court found this argument inapplicable because the challenged law was not concerned about taxpayers' use or abandonment of the property, only their failure to pay taxes, stating that there was no precedent "suggesting that failing to pay property taxes is itself sufficient for abandonment." *Id.*

Far from benefitting the Marons, *Tyler* demonstrates the distinction between a taking forced upon an individual versus a state's retention of the benefit gained from unclaimed property in its custody. *Id.*; *see also Texaco*, 454 U.S. 516 (1982). In *Tyler*, the Supreme Court made a point to distinguish the facts of the case from the facts in *Texaco*. The owners in *Teaxco* lost their property because they made *no* use of their interest in the property and then failed to take the simple step of filing paperwork indicating that they still claimed ownership over the interest. In comparison, the owner in *Tyler* lost

her property due to her failure to pay taxes, not due to her lack of use. Minnesota's law gave no weight to the taxpayer's use of the property; indeed, the delinquent taxpayer could live in and make use of their home for years after falling behind in taxes.

The present matter does not relate to the seizure of real property due to a failure to pay taxes or the State of Florida's retention of the total value of the seized property. The Department has not "taken" anything from the Marons. Like the property in *Texaco*, the property here was presumed unclaimed and delivered into the custody of the Department due to the owner's failure to exercise dominion or make any use of it. Unlike the county in *Tyler*, the Department is not withholding a portion of the property it took possession of. If the Marons file a claim and demonstrate entitlement, the subject unclaimed property will be returned in the same condition and with the same monetary value as when it was remitted to the Department.

## II. <u>There was not a Justiciable Controversy before the District Court</u>

Article III of the Constitution confines federal courts' jurisdiction to "Cases" and "Controversies." A 'controversy' in this sense must be one that is appropriate for judicial determination and is distinguishable from a dispute of a hypothetical character. *Osborn v. Bank of United States*, 22 U.S. 738, 819 (1824); *see also United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920). The party seeking to invoke the jurisdiction of the federal court bears the burden of establishing that there is a justiciable controversy before it. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

## A. The District Court Erred in Finding the Marons had Standing to Assert their Claims

For a litigant to establish Article III standing, he must allege (and ultimately prove) that he has a genuine stake in the outcome of the case because he has personally suffered (or will imminently suffer): (1) an injury in fact; (2) that is traceable to the challenged actions of the defendant; and (3) that is redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### 1. Injury in Fact

An injury in fact is an invasion of a legally protected interest that is concrete, particularized, and actual or imminent, not conjectural or hypothetical. *Id.* at 560; *see, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 495-496 (2009) (vague plan to visit unnamed National Forests "someday" did not establish "actual or imminent injury" for standing to challenge government action affecting particular forest); *Finkelman v. Nat'l Football League* 810 F.3d 187, 195 (3d Cir. 2016) (consumer who sued NFL for inflating Superbowl ticket prices but did not purchase tickets himself failed to establish particularized injury). According to the Supreme Court, this key requirement has three components, obligating the litigant to demonstrate that he has suffered an injury that is (1) concrete, (2) particularized, and (3) actual or imminent. *Lujan*, 504 U.S. at 560–61.

To have an injury-in-fact, a litigant must establish that he has suffered or is imminently threatened with a concrete injury—that is, an injury that is real and not abstract. *Spokeo*, 578 U.S. at 340. Although the Supreme Court has not articulated a

bright line rule on what makes a particular harm sufficiently concrete for standing purposes, it has provided broad guidance. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) (stating that liability for payment of a tax that allegedly discriminated against out-of-state interests in violation of the Commerce Clause amounts to a concrete harm); *Franchise Tax Bd. v. Alcan Aluminum*, 493 U.S. 331, 336 (1990) (determining that shareholders' reduced returns on their investments from an accounting method employed by California in calculating taxable income of companies in which they had invested is a concrete harm). The litigant must demonstrate that the injury is particularized—or, in other words, that it affects him in a personal and individual way. *Lujan*, 504 U.S. at 560 n. 1. The particularized injury requirement bars litigants from seeking judicial redress for generalized grievances undifferentiated from those that many people could claim. *Id.* at 573-74; *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208 (1974). Even if an injury is particularized, it might not amount to a concrete injury sufficient for standing if does not actually present a material risk of harm to the litigant. *Spokeo,* 578 U.S. at 334-36.

Finally, a litigant must have suffered an actual or imminent injury or, have sustained or [be] immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted). Imminence for Article III standing purposes means that a claimed threatened injury must be certainly impending; otherwise, it is too speculative to constitute an

injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (a litigant's injury must either have already occurred, be presently occurring, or will imminently occur).

The Marons Complaint is premised on the idea that when they file a claim and receive no interest, a taking will have occurred. Yet they argue that there has been an injury in fact because "the State took their property without paying them just compensation . . . . They have standing to pursue prospective declaratory relief [for a] past wrong . . . causing continuing harm from the ongoing loss of the time value of their property." Initial Brief, p. 11. Their own allegations demonstrate that they have not filed a claim, and that nothing has been taken from them. Furthermore, the only thing causing the Marons' continuing harm is their continued failure to exercise any dominion over the property.

The Marons' allegations and argument oversimplify and misconstrue the claim process. FLUPA allows any person to file a claim with the Department for unclaimed property in its custody. § 717.124, Fla. Stat. Once a claim has been received, the Department determines the merits of the claim and whether the claimant established entitlement to the property by a preponderance of the evidence. *See* §§ 717.1244, 717.126, Fla. Stat. ("Having the same name as that reported to the department is not sufficient, in the absence of other evidence, to prove entitlement to unclaimed property.").

The Marons have not alleged that they filed a claim, that they possess documentation that would prove entitlement to the unclaimed property by a preponderance of the evidence, that the Department has determined whether they are the rightful owners, or that interest was withheld from their disbursement. Instead, the Marons allege that *when* they file a claim, the Department will not pay them the interest earned on the unclaimed property while it was in the Department's possession. The allegations amount to nothing more than the Marons may suffer an injury, that may be attributable to FLUPA, at some future date and time. This alleged hypothetical injury is not a particularized one, as it is no different than that shared by all members of the public who may one day file a claim with the Department, nor is it a concrete injury that has caused harm or presents any material risk of harm.

## 2. Traceable to the Department's Actions

In addition to an injury in fact, there must be a causal connection between that injury and the conduct complained of, *i.e.*, a plaintiff's claimed injury must be "traceable" to the defendant's acts or omissions. *Lujan,* 504 U.S. at 559-560. In *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976), plaintiffs sued the Secretary of Treasury claiming they were denied access to medical services as a consequence of an IRS ruling that eliminated the requirement that tax-exempt hospitals provide certain services to indigents. The Court found that the plaintiffs lacked standing because they could not

show that their alleged injury (denial of medical services) was traceable to the IRS ruling rather than the hospitals' independent action. *Id.*

Similarly, in this case, the Marons have not and cannot demonstrate that their alleged injury (non-payment of interest) is traceable to the challenged provision of FLUPA rather their own neglect and abandonment. Nor can they demonstrate that their alleged injury would not be traceable to the fact that they may not be the rightful owners of the unclaimed property, or, even if they are, they may not have the documentation to prove such ownership by a preponderance of the evidence.

### 3. Redressable by a Favorable Judicial Decision

Lastly, the requested relief must redress the alleged injury suffered by a plaintiff. *Spokeo*, 578 U.S. at 338; *Lujan*, 504 U.S. at 560-561. This requires the litigant to demonstrate that the injury he has purportedly suffered would likely be redressed if the court granted the relief that he has requested. *Steel Co.*, 523 U.S. at 107; *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). When analyzing the redressability element of standing, the Supreme Court has focused on the specific relief requested by the plaintiff in its complaint and considered whether granting that relief would redress the injury alleged. It is not enough that a favorable judgment will benefit the public at large or simply make Plaintiff happy - psychic satisfaction is not enough for Article III standing. *Steel Co.*, 523 U.S. at 107. Plaintiffs lack standing to sue for declaratory relief if they

could not benefit from the requested relief. *Slayman v. Fed Ex Ground Package Sys., Inc.*, 765 F.3d 1033, 1047-48 (9th Cir. 2014).

Even if, assuming *arguendo*, the Department had to pay interest on unclaimed property, that does not guarantee the Marons' would receive any interest as their alleged future claim may not be approved. The claim could be deficient to establish entitlement to the unclaimed property on several grounds, but neither party will know that until the Marons submit a claim, and the Department renders a determination pursuant to FLUPA. Thus, any declaration a court could make may not redress the Marons' alleged injury.

## B. The Marons' Claims are not Ripe for Judicial Resolution

A case presents an actual controversy within the meaning of the Declaratory Judgment Act if there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaration. 28 U.S.C. § 2201(a); *e.g., Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972); *Household Bank v. JFS Grp.*, 320 F.3d 1249, 1253 (11th Cir. 2003). The mere existence of a statute which may or may not ever be applied to plaintiffs is not sufficient to create a case or controversy. *See Western Min. Council v. Watt*, 643 F.2d 618 (9th Cir. 1981).

The Marons have not established they are the real parties in interest or that they have a suffered, or will suffer, a concrete and particularized injury that separates them from the public at large. Here, the absence of an agency determination renders the

Marons' lawsuit unripe. A court lacks subject matter jurisdiction over a case if it is not ripe for judicial resolution. *Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.*, 509 Fed. Appx. 919, 921–22 (11th Cir. 2013). The Marons argue that their claims are ripe because they need not exhaustive administrative remedies citing to *Knick v. Twp. of Scott, Pennsylvania,* 139 S. Ct. 2162 (2019), and *Pakdel v. City of San Francisco*, 141 S. Ct. 2226 (2021). Initial Brief, p. 12. However, the Marons over generalize the holdings in these two cases.

In *Knick*, the plaintiff challenged a local ordinance under § 1983 alleging that it violated the Takings Clause of the Fifth Amendment. *Id.* at 2168-69. Relying on *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the district court dismissed the action because the plaintiff failed to bring an inverse condemnation action in state court, and the Third Circuit affirmed. *Knick,* 139 S. Ct. at 2163. Under *Williamson*, a plaintiff had to show that they received a final decision from the relevant government agency, and that they exhausted its state-court remedies. 473 U.S. at 186, 194-95. The Supreme Court in *Knick* effectively eliminated the exhaustion requirement in *Williamson* holding that property owners have an actionable Fifth Amendment claim when the government takes their property without paying for it, regardless of subsequent state court proceedings, but left *Williamson's* finality requirement intact. *See id.* at 2169-70. Thus, a takings claim is not ripe until the government entity charged with implementing the regulations has reached a final

decision regarding the application of the regulations to the property at issue. *Williamson,* 473 U.S. at 186.

In *Pakdel*, the plaintiffs sought an exemption from this requirement and were twice denied. 141 S. Ct. at 2228. The plaintiffs then sued in federal court. *Id.* The district court dismissed their claims because they had not complied with the city's administrative procedures for seeking relief, and the Ninth Circuit affirmed. *Id.* at 2229. In holding that the plaintiff did not need to exhaust administrative remedies for the sake of exhaustion, the U.S. Supreme Court affirmed that *Williamson's* finality requirement is still alive well, stating that a federal court should not consider a claim alleging a regulatory taking *before* the government has reached a *final decision* to ensure that "a plaintiff has actually been injured by the government's action and is not prematurely suing over a hypothetical harm." *Id.* at 2230-31. (emphasis added).

Here, the Department has not rendered any decision, final or otherwise, and until it does, a federal court should not consider the Marons' claims. *See Suitum v. Tahoe Reg. Planning Agency*, 520 U.S. 725, 734-37 (1997); *Horne v. Dep't of Agriculture*, 569 U.S. 513, 525 (2013).

## III. <u>The District Court Erred by Failing to Dismiss Count I on the basis of Sovereign Immunity</u>

The Eleventh Amendment provides, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects

of any Foreign State." U.S. Const. amend XI. Under current law, therefore, the Eleventh Amendment is a bar to federal court jurisdiction whenever any private citizen attempts to sue a state. *Hans v. Louisiana,* 134 U.S. 1, (1890) ( Eleventh Amendment bars both in-state as well as out-of-state citizens from suing a state); *see, e.g., Monaco v. Mississippi,* 292 U.S. 313, 322 (1934) ("[A]lthough a case may arise under the Constitution and laws of the United States, the judicial power does not extend to it if the suit is sought to be prosecuted against a State, without her consent, by one of her own citizens").

There are three qualified exceptions to Eleventh Amendment immunity. *See Virginia Office Protection & Advocacy, v. Stewart*, 563 U.S. 247, 253-54 (2011). First, a state may waive the protection of the Amendment by consenting to the suit. Second, Congress, under certain provisions of the Constitution, may abrogate the sovereign immunity of the states through statute. Third, a federal court may enjoin a "state official" from violating federal law. *Ex parte Young,* 209 U.S. 123, (1908). None of these exceptions apply to the present case. Nevertheless, the District Court found that the Eleventh Amendment did not require dismissal of Count I because the Marons asserted a "claim not just for retrospective relief but also for prospective relief." However, the District Court's finding should be reversed. Doc. 27, p. 8.

## A. No Waiver of Immunity

The U.S. Supreme Court has long recognized that sovereign immunity from suit in federal court is a privilege that the state may waive at its pleasure. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Traditionally, a state may waive its Eleventh Amendment by voluntarily invoking the jurisdiction of a federal court or by making a clear declaration that it intends to submit itself to [a federal court's] jurisdiction. *Fla. Prepaid*, 527 U.S. at 675. (internal quotation marks omitted). This Court has ruled that it "will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a 'clear declaration' that it intends to submit itself to our jurisdiction." *Barnes v. Zaccari*, 669 F.3d 1295, 1309 (11th Cir. 2012) (holding that the state did not waive immunity because it did not invoke federal court jurisdiction and it raised Eleventh Amendment as a defense in its motion to dismiss).

Here, the Department was involuntarily brought into federal court. It did not then voluntarily proceed with the maturations of the case, rather it filed a motion to dismiss citing want of jurisdiction. Accordingly, the State of Florida has neither implicitly nor explicitly waived its sovereign immunity. *See id.* at 1308-09. The Marons, however, argue that the State of Florida has implicitly waived its sovereign immunity by virtue of its participation in the Plan of Convention citing to *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244 (2021). Initial Brief, p. 21. Nothing in *PennEast* supports that argument, and the Marons' reliance on it is misguided.

The primary issue in *PennEast* was whether the federal government can delegate its eminent domain power to private parties. 141 S. Ct. at 2262. Relying on the premise that states consented to the exercise of federal eminent domain power in the Plan of Convention, the Supreme Court ruled that the Eleventh Amendment does not bar condemnation proceedings brought by a private party with federally delegated eminent domain authority. *See Id.* at 2262-63. The Court went on to explain that all states implicitly consented to certain waivers of sovereign immunity at the founding of the U.S. Constitution, such as in bankruptcy proceedings, suits by other states, and suits by the federal government. *Id.* at 2258. The states consented in the Plan of the Convention to the exercise of federal eminent domain power, including in condemnation proceedings brought by private delegates and, thus, there is "no immunity left to waive or abrogate when it comes to condemnation suits by the [f]ederal [g]overnment and its delegates." *Id.* at 2263.

*PennEast* does not apply in the present case because the Marons are private citizens without any federally delegated power or authority. The Supreme Court did not extend this waiver to lawsuits filed by private citizens with no federally delegated power, and neither should this Court. Therefore, the District Court did not have jurisdiction to entertain the Marons' suit because Florida has not waived its sovereign immunity.

## B. 42 U.S.C § 1983 Does Not Apply to the State of Florida

Ordinarily, when a private litigant seeks to vindicate a federal constitutional right by seeking damages in a federal court, he must identify a cause of action created by Congress. 42 U.S.C. § 1983 allows a private litigant to sue the "person" who "subjects, or causes [him] to be subjected" to a constitutional deprivation. Such a claim is not available, however, against a state because a sovereign state is not a "person" within the meaning of § 1983. *McGuire v. Florida Lottery*, 520 Fed. Appx. 850, 851 (11th Cir. 2013) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Moreover, suits against state agencies or state officials acting in their official capacities are no different than suits against the state itself. *Id.*; *Brandon v. Holt*, 469 U.S. 471 (1985).

While § 1983 provides a federal forum to remedy deprivations of civil liberties, it does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivations of civil liberties because such suits are barred by the Eleventh Amendment. *Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468, 472–473 (1987); *Quern v. Jordan,* 440 U.S. 332 (1979) (§ 1983 does not abrogate the Eleventh Amendment immunity of the states). Similarly, if a § 1983 action alleging a constitutional claim is brought against a state, the Eleventh Amendment bars a federal court from granting any relief on that claim. *See Alabama v. Pugh,* 438 U.S. 781 (1978).

## C. *Ex parte Young* Exception does not Apply

Pursuant to *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment generally does not bar the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law. *Id.* at 158–59. Because the enforcement of "an unconstitutional statute is void, and therefore does not impart to [the officer] any immunity from responsibility to the supreme authority of the United States," the Supreme Court has held that the officer is not entitled to protection by the state's sovereign immunity. *Green v. Mansour*, 474 U.S. 64, 68 (1985) (quoting *Ex parte Young*, 209 U.S. at 160). However, the *Ex parte Young* doctrine is not without limitations. To determine if the *Ex parte Young* exception applies, courts must consider, first, whether the complaint alleges an ongoing violation of federal law, and second, whether the complaint seeks relief that can be characterized properly as prospective. *Verizon Md, Ind. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). The Marons assert their claim in Count I falls within the *Ex parte Young* doctrine and is not barred by the Eleventh Amendment because they seek only declaratory and injunctive relief under the Fifth Amendment. Initial Brief, p. 13. However, this Court need not look any further than the Complaint's prayer for relief because the relief the Marons seek is money damages. Doc. 18, p. 22-23.

In *Edelman v. Jordan*, the U.S. Supreme Court held that sovereign immunity would protect state officials sued in their official capacity if the relief sought is retroactive. 415

U.S. 651, 664-78 (1974). There, the plaintiff sought injunctive relief against several state officials for administrating their programs in violation of federal regulations. *Id.* at 653. Relying on *Ex parte Young*, the district court issued an injunction requiring the officials to adhere to the federal regulations and ordered them to compensate the beneficiaries of the program for past benefits that had wrongfully been withheld. *Id.* at 656. The Supreme Court found that the Eleventh Amendment barred the portion of the district court's decree that ordered retroactive payment. *Id.* at 652. The *Ex parte Young* exception is only applicable in cases where prospective, injunctive relief is sought. *Id.* at 664. Accordingly, if the relief is "analogous to a retroactive award that requires 'the payment of funds from the state treasury,'" then the court must dismiss the claim. *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 690 (1982). To determine whether relief sought is retroactive or prospective, courts must "look to the substance rather than the form of the relief sought." *Papasan v. Allain*, 478 U.S. 265, 279 (1986) (holding purportedly prospective relief barred as retroactive claim where "plaintiffs [we]re essentially asking for a further payment from the treasury of the Commonwealth").

The Marons prayer for relief can be boiled down to the following requests: (1) a declaration that section 717.124(4)(a) of FLUPA violates the Constitution and 42 USC § 1983 and that when the Marons and the class claim the property, the Department must pay them for the time or other value of the property while it was in the

Department's custody; (2) a declaration as to the measure of the time of other value that the Department must pay the Marons and the class; and (3) an injunction requiring the Department to pay the Marons and the class the time or other value of the property when they claim it. Doc. 18, p. 22-23.

The requested injunctive relief is a request to make the Department pay the Marons and class members past monetary gains *when* they file a claim in the *future*. This amounts to nothing more than a prospective request for retroactive money damages. The relief is retroactive because it depends on the interest the unclaimed property gained in the past, while it was in the Department's custody. Allowing this argument to circumvent a state's immunity would render the Eleventh Amendment meaningless in the takings context. There would be no significant difference between a federal court judgment awarding money and a federal court judgment ordering a state official to pay money; the result would exactly be the same. This is exactly the type of mischaracterization that the Supreme Court warned about in *Edelman*. 415 U.S. at 666-68. Furthermore, this Court has previously held that if the relief sought from a state "is the equivalent of money damages," then the *Ex parte Young* exception does not apply. *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999). The practical effect of the Marons' requested relief would be an order directing payment from the State Treasury of specified amounts calculated by reference to interest putatively earned during the period prior to determination of whether such relief is

available. *See, e.g., Fontenot v. McCraw,* 777 F.3d 741, 754-55 (5th Cir. 2015) (rejecting the plaintiff's argument that the State engages in a continuing violation by refusing to return their property and holding that sovereign immunity barred their refund claims). Accordingly, the *Ex parte Young* exception does not apply in the present case.

## CONCLUSION

This Court should uphold the District Court's dismissal of Count I for failure to state a claim upon which relief can be granted and the District Court's dismissal of Count II based on the Eleventh Amendment immunity. Alternatively, this Court should find that the District Court lacked subject matter jurisdiction as to both Counts of the Complaint because (1) the Marons lacked standing to bring their claims, (2) their claims were not ripe for judicial review, and (3) their claims were barred by the Eleventh Amendment.

Respectfully submitted on February 7, 2024,

*/s/ Michael Dobson*
Michael Dobson
Kimberly Masson
Russell Monilla
Department of Financial Services
Office of the General Counsel
200 East Gaines Street
Tallahassee, FL 32399
Telephone: (859) 413-3100
Facsimile: (850) 488-0697
michael.dobson@myfloridacfo.com
kimberly.masson@myfloridacfo.com
russell.monilla@ myfloridacfo.com

*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,784 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced type face using Microsoft Word in 14-point Garamond font.


*/s/ Michael Dobson*
Michael Dobson

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2024, I electronically filed the foregoing brief with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Michael Dobson*
Michael Dobson
